Carr, J.
I think the judgment of the county court was right. I admit, that no sale of the flour by Harper to Patton, was intended or effected by this transaction: Patton agreed to take Harper's flour, send it to Richmond, and have it turned into money: therefore, all fair risks on the flour were to be incurred by Harper, while it remained his. If the agreement had been, that it should be sold on a credit, (which does not seem to have been the fact), Harper, I think, would have hazarded the solvency of the purchaser : but so soon as the flour was turned into money, and that money in the hands of the commission merchant, it became, I think, Patton's money, and a payment by Harper of his debt. We are not told, that in sending the flour to the merchant, Patton gave him any information, that it was *313 Harper s flour : lie treated it precisely as his own, sent it to his own commission merchant, to whom he was m the habit of sending his produce, and directed him to sell it, and remit the money to him at Baltimore. Suppose, after the money was in the merchant’s hands, Harper had been in Richmond, and, having a most pressing call for money there, had applied to this merchant for it: would he have got it? would not the merchant have told him, “I know nothing of you in this business; I have received flour from M,r. Patton, have sold it according to his directions, and am bound, both by those same directions and my own letter to him, to remit the proceeds to him at Baltimore?" could Harper have enforced his demand ? No. Between him and the commission merchant, there was no contract, no privity. If Harper had seen the merchant about to abscond full-handed, he could not have saved the debt, as one due to him, by attachment or any other process. This, then, was no longer his property, or Ms money. Whose then? Patton’s. The merchant had passed it to bis credit, along with all his other funds in his hands. Is it not clear, that ibis was the idea of the parties ? Harper bad parted with all control over the flour, with the understanding that it should go to Patton?s agent, and the proceeds be a payment, pro tanto, of liis debt: when ? whenever received by Patton’s agent. Tt appears, that Patton was in the habit of sending produce to this same agent to sell; this proves, that he thought his money safe in his hands. We may fairly conclude, then, that he had no objection to that risk in regard to this flour, which he was constantly incurring in all his other produce. Nor do we hear, that he made any difference in this consignment; that he informed the merchant, that this was not his flour, nor at his risk, or desired him to enter it as Harper’s flour, and to credit him by the proceeds: on the contrary Patton’s orders were, “ sell this flour, and remit the proceeds to me at Baltimore, about the 1st of May, when I expect to he there.” Suppose Patton had gone to Richmond, immediately after the flour was sold; *314 and, having occasion for the money, had made application to the merchant for it: ought he hot to have paid it to him ? Suppose Patton had' got timely notice of his tottering condition, could he not have made any arrangement in regard to this money, precisely as he could for his other funds in the merchant’s hands ? These are the indicia of property: they all prove, that it was in Patton. I must conclude, then,, that, both from the meaning of the parties, and the operation of the law, this was a payment to him. The money in the merchants hands was his; and his must be the loss from that merchant’s failure.
Green, J.
I think the judgment of the circuit court, should be affirmed.
The substance of the transaction was, that Harper constituted Patton his agent, to dispose of his flour for him, in the usual course of Patton's business, and to apply its proceeds, when received, to Harper's credit with him : and an authority to dispose of it through the instrumentality of a sub-agent, was not only implied from the nature of the transaction, but more strongly, from the contemporary declaration made by Patton to Harper, that he should dispose of it through tire agency of a commission merchant, with whom he usually dealt, and whose solvency and integrity he had no reason to doubt. And Harper admitted, that Patton had used all the diligence in his power, to carry the arrangement into effect, in causing the flour to be sold, and endeavouring to secure the proceeds. Suppose the arrangement, had been, for Harper's accommodation, and in order to induce some other creditor to forbear, that Patton should send the flour to his commission merchant to be sold, and should account for the proceeds to such other creditor; could such other creditor have held him accountable for the proceeds, though never received by him, and that without any default in him? The circumstance, that Patton alone could maintain an action against the commission merchant (if that were admitted) does not vary the case: for, in that *315 case, he would be held accountable to Harper, only as a trustee for him.
There is no valid objection to the form of the forthcoming bond, or the judgment. It is sufficient, that the bond recites the levying of the execution, and upon what specific property: if that had been the property of a stranger, the bond would have been nevertheless good and binding. The irregularity in the terms of the judgment is only matter of form.
Coalter, J.
I am of opinion, that the judgment of the circuit court must be affirmed. I cannot perceive how the circumstance, that the merchant entrusted to sell the flour, was the commission merchant who usually transacted Patton’s business in Richmond, can affect this case. It is said, that Patton confided his other business to him, and therefore all he wanted was to get the flour into his hands, as he would then be sure of the money, so soon as the flour was sold. No doubt, he thought it would be safe in his hands : if he had not thought so, if he entertained a suspicion of the agent, he ought to be held accountable for not making his suspicions known. The more confidence he had, the more innocent and honest he is. He acted with good faith. Both parties are equally innocent: and the question is, who shall bear the loss ? The debtor, who has gained time from his creditor, to try and make his crop available to discharge his debt ? or the creditor, who has granted this indulgence, and moreover rendered services, without compensation, in sending the flour to market ?
The debt has not been actually paid to the creditor. There has been an effort to pay it; but the money has been lost, without the fault or neglect of either party. It seems to me, that the case must be decided, as it would be \i Patton had had no particular commission merchant in Richmond, but the flour had been sent to one named by either party, and agreed on by both, to be the person to whom it was to be sent; or, as if Patton had been authorised to *316 Send it to any one he might select, and had made the selection with due caution and care.
The question is, whether Patton, by himself or his agents ever received this money in discharge of this debt? Was the merchant his agent to collect this debt for him ? to receive the money from Harper, or from the sale of his effects, for Patton, so that, so soon as the effects were sold, and the money received, the payment of the debt was complete, as much so as if it had been paid into Patton’s own hands, and he had given a receipt therefor ? It is admitted, that Patton was to be at no risk in the transmission of the flour. He had a right to have the proceeds remitted to him at Lexington, or at some other equally convenient place. His debtor was bound to seek and pay him his debt, he had an execution hanging over him, which would force a payment into his hands at home: therefore, it cannot be supposed, that he was to travel to Richmond, to collect it there, unless perfectly convenient for him to do so: or that he was to be at the risk of its remittance to him from thence. He received no premium for any risk, and was to he at none. This seems to be admitted on all hands :, and yet it is insisted, that he must lose the debt.
Suppose the merchant had not failed, but had remitted the money in bank bills, and they had been lost. This could not be Patton’s loss, unless the risk of remittance be thrown on him. Suppose the remittance had been in a bill of exchange, believed at the time to be good, but was dishonoured, and finally proved good for nothing: it seems to be admitted, that if such a bill had been taken in payment for the flour, the loss would have been Harper’s. Should it be otherwise, if the money had been paid for the flour, and instantly laid out in a bill, for the purpose of remittance ?
But why was Patton to have any thing to do with the flour ? His aid was called in, no doubt, that he might be certain, that the money, when received, would be paid into his hands. Suppose this object had been effected in some other way: suppose, for example, Harper had said to Pat *317 ton, “ T will send this flour to such a merchant in Richmond: ... . 1 will assign the bill of lading to you : 1 will moreover write to the merchant, that my property is under execution for your debt, and that the net proceeds of the flour, when received, are to be paid to you; that he shall consider this as an irrevocable order in your favour for those proceeds, and shall pay the same over to you or your order, as if you yourself had sent the flour to him.” The flour is received and sold for cash, and the merchant fails. Surely, this would be no payment of the debt by Harper. I cannot well see how such a case would he materially variant from that before us.
It is admitted, that Patton has been guilty of no negligence ; that he was to receive no benefit by the transaction, but on the contrary, submitted to delay, and encountered .some trouble, for nothing; and this, at the pressing solicitation of his debtor.
But it is said the merchant was the agent of both parties, in different stages of the transaction : that, in receiving and selling the flour, and even in receiving the money for it, he was the agent of Harper, but that, from the moment he had accomplished the receipt of the money, be was the agent of Patton, and answerable to him alone for his conduct, since he knew nothing of Harper in the business, and could only be responsible to him, in a controversy to which Patton was a party : that the moment ho sold, and the money was received, Harper's risk ceased ; it was then Patton's money. How so ? True, he has a right of action for it: but so he would have had, if the flour had been lost by the negligence of the -merchant; or if he had, without authority, sold it on a credit, and the debt had been lost; in which cases, it is admitted, the loss must have been Harper's. The liability of the merchant to Patton then, cannot be the test of the question, who is to bear the loss. He would have been in like manner liable, if the contract between Harper and Patton had expressly stipulated, that, until the money was actually paid into Patton's hands, it should be at Harper's risk. Nor would these have been *318 contradictory, unlawful, or unreasonable stipulations. It would only have been expressly stipulating for what appears to me to be the legal and necessary meaning and result of the contract that was made. The merchant (it seems to me) held Harper’s money to be paid over to his creditor, who had also a lien on it in his hands, or rather an absolute right to enforce payment of it, but he was not less Harper’s agent for the purpose of paying over, than he was his agent for receiving and selling; nor can he be otherwise considered, merely because he did not know Harper in the transaction. This also would equally have been the case, if there had been an express stipulation (unknown to him) between Harper and Patton, that all was to be at Harper’s risk, though transacted in Patton’s name, until the money was paid over. He stood (as it seems to me) in the nature of an acceptor of Harper’s draft, in favour of Patton, to pay the proceeds of the flour over to him as soon as they were received.
If Patton had drawn on the merchant for the proceeds of this flour, to be paid the moment it was sold and the proceeds received, (which would have been a method of drawing it out of his hands, with as little risk as possible to Harper), and this order had been presented and accepted, on the day of sale, for the net proceeds, naming the sum, for which the flour was sold, and (the acceptor failing at the instant) the draft had been dishonoured : would this have been Patton’s loss? or, suppose he had arrived in Richmond, an hour after the sale and receipt of the money, and had demanded it in vain. In either case, would it have been a payment by Harper of his debt ? If it would, it must be because the money was to be at Patton’s risk, whether in a course of remittance or otherwise, from the moment the merchant received it, it being then a complete payment to him, not simply a right in him to receive and enforce the payment of it, to be placed to Harper’s credit, when received.
On the whole, I think that the merchant, though responsible to Patton, was, nevertheless, so far as it regards the *319 question of risk, as much the agent of Harper, to pay over the 'money, as ho was to receive and sell the flour ; and that, until the proceeds were actually so paid over, unless some fault in Patton should occasion loss, the whole risk was on Harper.
Cabell, J.
The question is, on whom the loss occasioned by the failure of the commission merchant, shall fall ?
The arrangement between the parties certainly constituted a bailment. But the question, as to the loss, depends not so much on any principle peculiar to the law of bailments, as on the intention of the parties, as to the time when the net proceeds of the flour were to be applied to the credit of Harper on the forthcoming bond. If it was intended, that the money should be thus applied, at the moment it got into the hands of the commission merchant, then the receipt of the money by him, made it, ipso facto, Patton’s money : and, consequently, the loss of it must fall on him. If, on the contrary, it was not intended by the parties, that the net proceeds of the flour should he applied to the credit of Harper until Patton himself had received them, or had applied them to his own use, or until by due diligence, he might have so received or applied them, then it is manifest, that the mere receipt of the money by the commission merchant., did not make it Patton’s money; and,.consequently, that as Patton has been guilty of no negligence, the loss must fall, not on him, hut oil Harper. Bearing these principles in mind, let us look at the situation of the parties, and the terms of the contract. Patton’s debt was perfectly secure, and he had already resorted to legal measures to enforce payment of it; and that object would have been speedily accomplished, if the law had been left to take its course. Overcome by Harper’s repeated and urgent solicitations, he consented, most reluctantly, for Harper’s accommodation, to suspend legal proceedings, and to send the flour to Richmond, to be sold by the instrumentality of a third person, with the understanding, that the net proceed® *320 should be applied to the credit of the forthcoming bond. Did the parties intend, that Patton should take on himself the risk of the insolvency of the agent of sales ? Did they intend that Patton should be debited with the net proceeds of the flour, although they might never come to his hands ? In the situation in which the parties stood towards each other, it would have been most unreasonable in Harper to ask such a stipulation, and folly in Patton to have acceded to it. No such stipulation can be inferred from the case presented by the record. The contract undoubtedly was, that the proceeds of the flour should be applied to the debit of Patton, when they should be received by him. This view of the case is not changed by the circumstance, that the person selected to sell the flour was the commission merchant who transacted Patton’s own business: he was selected, not because he was Patton's merchant, but because he was believed to be a safe hand. Nor is it material, that Patton might have sustained an action against the commission merchant : he might also have sustained an action against the common carrier, by whom the flour was sent to Richmond, if that carrier had violated his trust by selling the flour, and applying the proceeds to his own use; and yet, in that case, no body would jtretend, that the loss, if the carrier proved insolvent, would fall on Patton.
The objections taken to the bond, are not valid. The bond recites the levying of the execution, and the property on which it was levied; and even if that property had belonged to a stranger, it would not impair the obligation of the bond. And, from the nature of the transaction, the property which had been taken by the sheriff in execution, must have been restored to the owner, upon the execution of the bond for the forthcoming and delivery of it: if it had not been so restored, that would have been a substantive ground of defence; but nothing of the kind was pretended.
The irregularity in the terms of the judgment is merely formal.
Judgment of the circuit court affirmed.